175 N.J. Super. 244 (1980)
418 A.2d 267
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ROGER STILLWELL, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued December 3, 1979.
Reargued June 2, 1980.
Decided July 16, 1980.
Before Judges SEIDMAN, MICHELS and FURMAN.
*245 David L. Kervick, Assistant Deputy Public Defender, argued the cause for appellant (Stanley C. Van Ness, Public Defender, attorney).
Mark Paul Cronin, Deputy Attorney General, argued the cause for respondent (John J. Degnan, Attorney General of New Jersey, attorney; Florence V. Hughes, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by MICHELS, J.A.D.
Defendant Roger Stillwell was indicted on August 6, 1977 by the Ocean County grand jury and charged with murdering his father, Daniel Stillwell, Sr., on June 23, 1971. Apparently, the local police, although suspecting that defendant had killed his father, had insufficient evidence on which to make an arrest until six years later when immunity was granted to Dennis Mitchell Iagulli (Iagulli), who was with him when the homicide occurred.
According to the State's proofs, on Wednesday, June 23, 1971, defendant and Iagulli went to a local bar in New Egypt, New Jersey. While at the bar defendant told Iagulli that he had to see his father and asked Iagulli to wait at the bar for him. Defendant went to his father's house and, according to a neighbor, Thomas Fields, defendant asked his father for five dollars to buy food, and defendant's father replied that defendant "wasn't getting any money; if he wanted food, to go inside the house and get what he wanted." Defendant returned to the bar and told Iagulli that he went to see his father about borrowing some money. He also told Iagulli that his father would not give him any money but just told him that he could have all the food that he wanted in the house. Thereafter, defendant and Iagulli left the bar and defendant asked Iagulli if he "wanted to go along with stealing some money from his father." Iagulli refused at first, but then agreed to be the lookout while defendant would steal the money. The plan was for Iagulli to watch the neighbor's house for the return of defendant's father. They *246 drove towards the father's house; however, when they were near, defendant said, that "[i]t's too light to go in now. Let's go back to the bar and try later." They drove by the house and returned to the bar. After they finished one beer they drove back to defendant's father's house. Defendant turned off the lights of the car as he approached the house, drove into the driveway and parked the car. Iagulli thought defendant's father was home and said, "Let's get out of here." Defendant, however, refused to go and said, "[M]aybe I can talk him out of some money." Defendant then knocked on the door and eventually his father opened the door and let them into the house.
The father asked defendant why he had returned and defendant responded that he came to get some money. Defendant's father refused to give him any money and made a disparaging remark about Iagulli, referring to him as a "drunken bum," and told Iagulli that he wanted him out of the house. Iagulli started to walk towards the door and as he did so defendant's father put his hand on Iagulli and started pushing him out the door. Defendant, who was sitting at the kitchen table, jumped up and said, "[H]ey, that's my friend you are pushing," and moved towards his father. Defendant's father then pushed Iagulli out of the house and slammed the door behind him. Iagulli went over to defendant's car and sat on the front fender. While there he heard defendant and his father arguing, followed by sounds of a struggle and a loud crash. He ran to the house, looked in the window and saw two people struggling. He saw one of them fall and then saw the other raise his hand over his head and swing something down at the person on the floor. When he saw the person standing swing again at the one on the floor he walked towards the back door. Defendant came running out of the house, pushed Iagulli aside and said, "Come on. Let's get the hell out of here." The two men got into the car and Iagulli asked defendant what had happened. Defendant said that he had gotten into a fight with his father and that he had taught his father a lesson. Defendant showed Iagulli a wrench and said, "This is what I hit him with ... I hit him hard enough to knock him down." Defendant said, "Let's go back to the bar ... I think I need a drink."
*247 Defendant and Iagulli drove back to the bar. Iagulli bought a six-pack of beer and thereafter they drove around. Defendant said to Iagulli, "I hope I didn't hit him hard ... I didn't mean to hit him hard," and remarked that maybe they should go back to his father's house and check to see how he was. When they returned to the house Iagulli stayed in the car and defendant went into the house. Iagulli could see defendant bend over, then stand up and then walk towards the back bedrooms, disappearing behind the wall. Iagulli then got out of the car and went into the house. He saw defendant's father lying facedown on the floor, covered with blood. Iagulli noticed the father's hands were stretched out. Iagulli heard him moan, became frightened and ran out of the house. Iagulli then again observed defendant in the kitchen bending over his father. Defendant left the house, carrying something long. He subsequently told Iagulli that he had taken his father's wallet, ring, watch and rifle.
They returned to the car. Defendant put the long object in the back seat and said to Iagulli, "I didn't mean to hit him that hard ... I hit him hard enough to kill him." As they were driving away defendant looked at Iagulli and said "you are in this as deep as I am ... you were there ... that makes you an accomplice," and "if I go to jail, you are going too." Finally, defendant told Iagulli, "but don't worry about it, ... I made it look like a robbery ... I took some things out of the house."
Defendant drove to a wooded area. Defendant threw the wrench in the woods and then they discussed an alibi, agreeing that they would say they had been at the bar all night. They returned to the bar, bought a case of beer and drove to Iagulli's house. While driving back defendant said to Iagulli, "I didn't mean to do it, but he should have never hit me. He should have never punched me." While they were sitting on the front porch of Iagulli's home, defendant said to Iagulli, "I killed him. I showed him ... he'll never hit me again."
On the following day, defendant's father was found dead, lying on his back on the kitchen floor. The kitchen was covered *248 with blood. Dr. Sinha, the pathologist who performed an autopsy on the victim's body, found a large laceration on the left side of the scalp, multiple fractures of the skull and a laceration of the brain. The injuries were ragged and deep and in Dr. Sinha's opinion were caused by a blunt instrument. He was also of the opinion that the multiple lacerations of the brain, associated with the severe blood loss caused the victim's death.
At the conclusion of the proofs, the trial judge dismissed the charge of first degree murder and submitted, without objection, the case to the jury on second degree murder and manslaughter. The jury found defendant guilty of manslaughter, and acquitted him of second degree murder. Defendant's motion for a judgment of acquittal notwithstanding the verdict on the ground that his conviction for manslaughter was barred by the statute of limitations was denied. The trial judge held that while defendant could not have been prosecuted for manslaughter by virtue of N.J.S.A. 2A:159-2, the limitation on prosecution set forth therein did not apply because he was indicted and tried for murder. Defendant was sentenced to State Prison for five to seven years, and this appeal followed.
Defendant seeks a reversal of his conviction and dismissal of the indictment or, alternatively, a modification of his sentence, contending, among other things, that the trial judge erred by denying his motion for a judgment of acquittal.
The relevant statute of limitations, N.J.S.A. 2A:159-2 (L. 1898, c. 237, § 152, amended by L. 1953, c. 204, § 1), provides:
Except as otherwise expressly provided by law no person shall be prosecuted, tried or punished for any offense not punishable with death, unless the indictment therefor shall be found within five years from the time of committing the offense or incurring the fine or forfeiture. This section shall not apply to any person fleeing from justice.
Since the only crimes not covered by the statute are characterized as those punishable with death, it would appear at first glance that manslaughter, which is not punishable with death but rather by a fine of not more than $1,000 or by imprisonment for not more than ten years, or both (N.J.S.A. 2A:113-5), is subject to the statute. However, the reference to the death penalty is not dispositive in light of State v. Zarinsky, 75 N.J. *249 101 (1977), which held that prosecution for the crime of murder in New Jersey is not subject to the statute of limitations despite the abolition of the death penalty. In reaching this conclusion the court, in part, explained:
A criminal statute of limitations is designed to protect individuals when the basic facts have become obscured by time. Toussie v. United States, 397 U.S. 112, 114-115, 90 S.Ct. 858, 859-860, 25 L.Ed.2d 156, 161 (1970); Sutherland, 3 Statutory Construction § 70.03, p. 301, n. 2 (4th ed. 1974). Balanced against this consideration is the right of the public to have criminals brought to justice. Our Legislature has determined that the societal interest in punishing the guilty is so strong with respect to certain crimes that the countervailing concern of protecting persons from prosecution for crimes in the distant past is wholly overcome. As to all other offenses, there is an absolute bar to prosecution after a specified period. See In Re Pillo, 11 N.J. 8, 17-18 (1952); Moore v. State, 43 N.J.L. 203, 209 (E. & A. 1881).
Despite the strong interest in preventing persons from being prosecuted at a time far removed from the alleged crime, at great prejudice to their ability to mount an effective defense, the crime of murder has never been subject to a limitations period in New Jersey.... [at 106-107]
........
We have no doubt as to the intent of the Legislature which passed the statute of limitations. Our decision in the instant case does no more than fulfill the intent of every legislature in the history of our State which has enacted a statute of limitations  by recognizing that the crime of murder has always been regarded as a special offense to which no limitation period applies. [at 114; emphasis supplied]
The State argues that "murder" refers to the common law offense, which encompasses manslaughter as a lesser included offense, and therefore our Legislature intended that manslaughter as well as murder be excluded from operation of the statute. We disagree. At the outset, when the 1898 criminal statute of limitations, which eventually became N.J.S.A. 2A:159-2, was passed, manslaughter, unlike murder, was not a capital offense. At that time, manslaughter was a separate offense from murder and not punishable by death. See L. 1898, c. 235, § 109 (now N.J.S.A. 2A:113-5). In 1953, when N.J.S.A. 2A:159-2 was amended to increase the number of years within which an indictment could be brought from two to five years, the state of the law as to the murder-manslaughter distinction had not changed. In fact, it is now settled that:
... manslaughter is an offense distinct from and not a degree of murder.... Murder in the second degree is distinguished from manslaughter by *250 the element of malice, essential to the former but not latter. [State v. Brown, 22 N.J. 405, 411 (1956)]
See, also, State v. Robinson, 139 N.J. Super. 475, 482-483, 488 (App.Div. 1976). Consequently, when our Legislature enacted and then amended N.J.S.A. 2A:159-2 it presumably knew that manslaughter was an offense separate and apart from murder and intended that the prosecution, trial and punishment for that crime be covered by the limitations set forth in the statute. See State v. Jenkins, 75 N.J. 392, 395 (1978) (Justices Clifford and Schreiber, dissenting).
Additionally, the legislative intent to exclude murder from operation of the statute of limitations is predicated on "a policy decision that certain crimes are so heinous as to be always amenable to prosecution." State v. Zarinsky, supra, 75 N.J. at 110. Manslaughter, by virtue of the absence of malice, is considered not to be of the same magnitude or degree of wrong as murder, and consequently, our Legislature recognized this by providing for a lesser punishment for manslaughter than murder.
Finally, we point out that State v. Jenkins, 156 N.J. Super. 9 (App.Div. 1976), aff'd o.b. 75 N.J. 392 (1978), and State v. Quinones, 140 N.J. Super. 237 (App.Div. 1976), aff'd o.b. 75 N.J. 391 (1978), relied upon by the State, are distinguishable and do not compel a different conclusion. These cases hold that the enhanced penalty provided by N.J.S.A. 2A:151-5 in the case of persons convicted of certain enumerated offenses while armed applied to manslaughter, even though that crime was not among those enumerated. The court found the legislative intent to be that the word "murder" as used in the statute should be used in the common law sense so as to encompass manslaughter. This conclusion is warranted in view of the clear design of the 1966 Firearms Control Act to increase punishment for persons using weapons during the commission of certain crimes. See Quinones, supra. However, the extensive legislative history of N.J.S.A. 2A:159-2 clearly evinces a legislative intent to treat manslaughter differently from murder with respect to the time limitation for prosecution and punishment.
*251 However, this does not end our inquiry. There still remains the critical issue of whether an indictment for murder for which there is no statute of limitations bars a conviction for the lesser included offense of manslaughter if the indictment is returned more than five years after the commission of the offense. The majority rule is that a person cannot be convicted of a lesser offense on a prosecution for a greater crime which includes the lesser offense, commenced after the statute of limitations has run on the lesser offense. The rationale underlying the rule is that "a statute of limitations in a criminal case, unlike such a statute in civil matters, is not merely a statute of repose but creates a bar to prosecution." Chaifetz v. United States, 109 U.S.App.D.C. 349, 288 F.2d 133, 135-136 (D.C. Cir.1960), cert. den. and rev'd on other grounds, 366 U.S. 209, 81 S.Ct. 1051, 6 L.Ed.2d 233 (1961). It is well settled in this State that there is an absolute bar to prosecution after the statute has run, State v. Zarinsky, supra 75 N.J. at 107; see In re Pillo, 11 N.J. 8, 17-18 (1952); Moore v. State, 43 N.J.L. 203, 209 (E. & A. 1881), and, therefore the statute can be asserted at any time, before or after judgment. Hence, we have no hesitancy in concluding that defendant's conviction for manslaughter was barred by N.J.S.A. 2A:159-2, even though he was indicted and tried for murder. See Schlosser, Criminal Laws of New Jersey (3 ed. 1970), § 57:71 at 126; 1 Wharton's Criminal Law (14 ed. 1978), § 90, at 415-417. In People v. Morgan, 75 Cal. App.3d 32, 141 Cal. Rptr. 863 (D.Ct.App. 1977), where defendant was tried on a charge of murder but found guilty of manslaughter, a lesser included offense, the California Court of Appeals reached the same conclusion, stating:
We first consider whether the statute should be held not to run on a lesser included offense.
In discharging the defendant from custody, the trial judge felt bound by People v. Rose (1972) 28 Cal. App.3d 415, 104 Cal. Rptr. 702. The Rose court held: "It has been the law of this state ever since People v. Miller, 12 Cal. 291, that on an indictment for murder  which crime is, of course, not governed by any statutory period  filed more than three years after the homicide, there can be no conviction for the lesser included offense of manslaughter unless the accusatory pleading shows some bar to the application of limitations. None having been alleged here, the conviction is jurisdictionally defective and must be reversed." (28 Cal. App.2d at p. 417, 104 Cal. Rptr. at p. 703.) We are convinced that the Rose court relied upon valid precedent in so holding.

*252 Appellant now urges us to reach a contrary conclusion, contending that the reasons for the Rose decision no longer apply.
An accusatory pleading must allege facts showing that the prosecution is not barred by the statute of limitations. At the time of the crime, Penal Code section 800 provided that charges of voluntary or involuntary manslaughter must be brought within three years of the commission of the offense. Of course, there is no statute of limitations on the crime of murder. (Pen.Code, § 799.) If a period of time in excess of that permitted by the statute has elapsed since the commission of the offense, facts must be alleged to show the defendant's absence from the state. A sufficient period of absence will toll the running of the statute. (People v. Crosby (1962) 58 Cal.2d 713, 724-725, 25 Cal. Rptr. 847, 375 P.2d 839.)
The statute of limitations in criminal matters is jurisdictional. An information that shows on its face that the prosecution is barred by the statute of limitations fails to state a public offense. (People v. McGee (1934) 1 Cal.2d 611, 613, 36 P.2d 378.) The point may be raised at any time, before or after judgment. (Ibid.) The California Supreme Court recently reaffirmed this rule of law, holding that the statute of limitations in a criminal case is a substantive, not a procedural, right, and is not waived by the failure to raise it at the pleading stage. (People v. Zamora (1976) 18 Cal.3d 538, 547, 134 Cal. Rptr. 784, 557 P.2d 75.)
We have reexamined the Rose rule as urged by appellant. We find that it is compelled by California law. The fact that defendant was charged with murder does not affect this result; the defendant was not guilty of murder, but only of involuntary manslaughter. The information charging defendant with murder necessarily charged defendant with involuntary manslaughter as well. (In re McCartney (1966) 64 Cal.2d 830, 831, 51 Cal. Rptr. 894, 415 P.2d 782; People v. Carmen (1951) 36 Cal.2d 768, 773, 228 P.2d 281.) The information shows on its face that the charge of involuntary manslaughter was barred by the statute of limitations. Thus, the conviction was jurisdictionally defective.
In accord with this rule holding the statute to be jurisdictional and thus nonwaivable are Waters v. United States, 328 F.2d 739 (10 Cir.1964); Chaifetz, supra, 288 F.2d at 135-136; Benes v. United States, 276 F.2d 99 (6 Cir.1960); Askins v. United States, 102 U.S.App.D.C. 198, 251 F.2d 909, 912 (D.C. Cir.1958); John v. State, 89 Wis.2d 214, 278 N.W.2d 235, 237 (Wis. Ct. App. 1979); Holloway v. State, 362 So.2d 333, 334 (Fla.Ct.App. 1978), cert. den. 379 So.2d 953 (Fla.Sup.Ct. 1980); Duncan v. State, 282 Md. 385, 384 A.2d 456 (App. 1978); State v. Fogel, 16 Ariz. App. 246, 492 P.2d 742 (App.Div. 1972); City of Cleveland v. Hirsch, 26 Ohio App.2d 6, 268 N.E.2d 600 (App.Div. 1971); Cunningham v. District Ct. of Tulsa Cty., 432 P.2d 992 (Okl.Ct.Cr.App. 1967); State v. Civella, 364 S.W.2d 624, 627 (Mo. Ct. App. 1963). See, generally, Padie v. State, 594 P.2d 50, 55, n. 9 (Alaska Sup.Ct. *253 1979). See, also, 21 Am.Jur.2d, Criminal Law, § 156 at 224-225; 22 C.J.S. Criminal Law § 225(3) at 584-585; 1 Wharton's Criminal Law (14 ed. Torcia), supra, § 90 at 417; Annotation, "Conviction of lesser offense, against which statute of limitations has run, where statute has not run against offense with which defendant is charged." 47 A.L.R.2d 887, 888 (1956); Note, "The Statute of Limitations in a Criminal Case: Can it be Waived?" 18 Wm. & Mary L.Rev. 823 (1977); Comment, "Waiver of the Statute of Limitations in Criminal Prosecutions," 90 Harv.L. Rev. 1550 (1977). Contra, United States v. Wild, 179 U.S.App. D.C. 232, 551 F.2d 418 (D.C. Cir.1977), cert. den. 431 U.S. 916, 97 S.Ct. 2178, 53 L.Ed.2d 226 (1977); United States v. Doyle, 348 F .2d 715, 718-719 (2 Cir.1965), cert. den. 382 U.S. 843, 86 S.Ct. 89, 151 L.Ed.2d 84 (1965); United States v. Parrino, 212 F.2d 919 (2 Cir.1953), cert. den. 348 U.S. 840, 75 S.Ct. 46, 99 L.Ed. 603 (1954); People v. Williams, 79 Ill. App.3d 806, 35 Ill.Dec. 63, 398 N.E.2d 1013 (App.Ct. 1979); Padie v. State, 594 P.2d 50 (Alaska Sup.Ct. 1979); People v. Lohnes, 76 Misc.2d 507, 351 N.Y.S.2d 279 (Sup.Ct. 1973) (which hold that a statute of limitations in a criminal matter may be waived under certain circumstances).
Accordingly, defendant's conviction for manslaughter is reversed and the indictment dismissed. In view of our decision it is unnecessary to consider the other issues raised by defendant on this appeal.